IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JOHN RAGGIO, <br><br>                          Plaintiffs, <br><br>              v. <br><br>JACINTOPORT INTERNATIONAL LLC, <br><br>                          Defendant. | JURY TRIAL DEMANDED <br><br> Civ. No. 1:10-cv-01908 (BJR) |

## UNITED STATES' COMPLAINT IN INTERVENTION

Comes now the Plaintiff, the United States of America, by and through its undersigned counsel, and for its Complaint in Intervention alleges as follows:

## INTRODUCTION

1.    In this action, the United States seeks to recover from Defendant Jacintoport International, LLC ("Jacintoport") treble damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-33, as amended ("FCA"). Beginning in 2008 and continuing at least through September 30, 2009, Jacintoport knowingly caused false claims for payment to be submitted to the United States Agency for International Development ("USAID") that contained overcharges for stevedoring services provided by Jacintoport in conjunction with a 2007 humanitarian food aid logistics services contract it held with USAID, bearing number TRN-C-00-07-00044-00 (the "Contract"). Although the Contract specifically capped the rates Jacintoport could charge to load humanitarian food aid from its warehouse onto ships (*i.e.*, stevedoring services) for delivery to needy areas of the world, Jacintoport regularly submitted invoices that exceeded these caps, and over the life of the Contract, inflated its invoices for

stevedoring services by not less than $500,000.00, thereby causing false claims for these services to be submitted to USAID.

2. The Relator in this action, John Raggio, originally filed this case on behalf of the United States in accordance with the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1), against Jacintoport and its corporate parent and grandparent, Seaboard Marine, Ltd. and Seaboard Corporation, respectively. Pursuant to 31 U.S.C. § 3730(b)(4), the United States entered its Notice Intervention on August 20, 2012 and now files this Complaint in Intervention against Jacintoport pursuant to the Court's August 21, 2012 Order.

3. In this Complaint in Intervention, the United States also asserts claims against Jacintoport for breach of contract and, in the alternative, on the common law theory of unjust enrichment.

## JURISDICTION AND VENUE

4. This action arises under the FCA, 31 U.S.C. §§ 3729-33, as amended, and at common law. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1345.

5. This Court has personal jurisdiction over Jacintoport because a substantial portion of the acts complained of herein, including the execution of the Contract and the submission of false claims, occurred in this district.

6. Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and under 31 U.S.C. § 3732(a), as Jacintoport transacts business within the District of Columbia, and the acts giving rise to Jacintoport's liability under the FCA occurred within this district.

## THE PARTIES

7. The Plaintiff in this action is the United States of America, acting on behalf of USAID.

8. The Relator is John Raggio, an individual whose business address is 68 West Main St., Oyster Bay, New York. Raggio is the Vice President and Chief Financial Officer of Sealift, Inc., a privately held vessel operating company that transacted business with Jacintoport as an ocean carrier contracted to transport U.S.-sponsored humanitarian food aid during the relevant time period.

9. The Defendant is Jacintoport International LLC ("Jacintoport"), a private port facility operator located at 16398 Jacintoport Boulevard, Houston, Texas. Jacintoport specializes in the storage and re-delivery of bagged agricultural commodities, which includes moving bagged commodities from railroad cars into its warehouse, storing those commodities in its warehouse, and re-delivering those commodities aboard ships at Jacintoport's pier.

## THE FALSE CLAIMS ACT

10. The FCA, in relevant part, provides that a person is liable to the United States for each instance in which the person "knowingly presents, or causes to be presented . . . a false or fraudulent claim for payment or approval . . . ." 31 U.S.C. § 3729(a)(1)(A) (2009) and 31 U.S.C. § 3729(a)(1) (1986).*

11. The FCA, at 31 U.S.C. § 3729(b), defines the term "knowingly" to mean that a person, with respect to information: "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of

---

* The Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(a), amended section 3729 of the False Claims Act, so as to (among other things) renumber the provisions describing the substantive violation asserted herein. The conduct alleged in this Complaint in Intervention began before the 2009 amendment and continued after the change; for ease of reference, the United States refers herein to the post-2009 provisions of the statute.

3

the truth or falsity of the information;" and further provides that no proof of a specific intent to defraud is required.

## THE PROGRAMS HARMED AND THEIR OPERATIONS

12.  The United States provides humanitarian food aid primarily under the auspices of the Food for Peace Program (Public Law 480, also known as the Agricultural Trade Development Assistance Act). Since its inception in 1954, the Food for Peace Program has provided aid to more than three billion people in 150 countries. The Food for Peace Program provides two types of aid: non-emergency and emergency. Non-emergency food aid, which is also known as "multiyear assistance programs," is designed to address long-term structural food shortages and involves the regular delivery of food aid. In contrast, emergency food aid is designed to address acute food shortages arising from natural or man-made disasters. It is this emergency food aid program that was directly affected by Jacintoport's overcharges.

13.  The emergency food aid program is administered by USAID and the United States Department of Agriculture ("USDA"). Broadly speaking, the USDA purchases food commodities while USAID pays for their storage and delivery through a series of agreements and contracts with non-governmental entities. The agreements relevant to this lawsuit are (a) grant agreements from USAID to various non-governmental organizations – including private voluntary organizations ("PVOs") and international governmental organizations such as the United Nations World Food Program – for the distribution of humanitarian food aid; and (b) contracts between USAID and port and warehouse facility owners in the United States (and around the world) for the receipt, storage, and loading of prepositioned humanitarian food aid. Between May 1, 2007 and September 30, 2009, Jacintoport held a contract with USAID for the

4

warehousing of prepositioned humanitarian food aid in Houston, Texas. As described below, Jacintoport's Contract also contained a fee schedule for services related to the receipt, storage, and loading of those prepositioned cargoes.

14.     When an emergency arises, such as the 2010 earthquake in Haiti, PVOs request a grant from USAID to deliver emergency food aid. These requests are evaluated by USAID based upon the nature of the crisis, the number of people who need assistance, the types of commodities needed, and the manner in which the food aid will be distributed. If a request is approved, USAID allocates a portion of its prepositioned food aid and agrees to reimburse the PVO for the cost of delivering the aid to the affected area of the world, typically via ocean voyage. After obtaining USAID's approval, the PVO, often working through a freight forwarder, solicits offers from various ocean carriers to transport the food aid from the warehouse to the location of the crisis. These solicitations by the PVOs specify the quantity of humanitarian food aid cargo, the type of commodity, and the port in the recipient country to which the cargo is to be delivered.

15.     Ocean carriers responding to the solicitation prepare offers specifying a rate per metric ton that they will charge to pick up and deliver the food aid. Included in the carrier's rate are the ocean carrier's own overhead and expenses (*e.g.*, the costs of operating the cargo ship), along with costs and expenses that the carrier must pay to third parties to complete the voyage (*e.g.*, port-related costs, insurance, etc.). Among these third-party costs is the stevedoring charge levied by the operator of the port where the prepositioned food aid is stored. The PVO submits the ocean carrier offers it receives to USAID. USAID recommends the most favorable offer and

authorizes the release of the prepositioned food aid. The PVO and the selected ocean carrier enter into a contract known as a "booking note."

16.     The carrier performs the food aid voyage, stopping first to load the food aid cargo onto its ship and then transporting the aid to the destination port. Pursuant to the terms of the booking note, the carrier invoices the PVO according to the agreed-upon shipping rates. In turn, the PVO submits a voucher to USAID to receive reimbursement for the costs of the voyage. Thus, USAID ultimately bears the entire cost of the food aid program, including the stevedoring charges incurred by the carrier to load the food aid cargo at the originating port – in this case, Jacintoport.

## JACINTOPORT'S 2007 WAREHOUSING AND LOGISTICS CONTRACT

17.     In 2006, USAID, through its Office of Procurement, Transportation Division in Washington, D.C., issued a solicitation for warehousing and logistics services for prepositioned food aid. Jacintoport successfully bid for this contract, and entered into a warehousing and logistics services contract, bearing number TRN-C-00-07-00044-00, in April of 2007. The Contract was effective May 1, 2007 and covered an initial term of two years. Ex. A, Contract at Sec. II.B. The Contract was modified a total of four times, and extended at the end of the initial contract period for an additional five months, until September 30, 2009. Ex. B, Modifications 1-4. The Contract and the modifications that followed were signed by David Labbe, who was Jacintoport's Vice President at the time the Contract was awarded in 2007 and who later became President of Jacintoport.

18.     The Contract covered all aspects of Jacintoport's involvement in the prepositioned humanitarian food aid program: from Jacintoport's receipt of the commodities, through its

6

storage in Jacintoport's warehouse, and until Jacintoport "re-deliver[ed]" those prepositioned commodities on a vessel bound for a crisis area. Ex. A, at Sec. I. The Contract provided that Jacintoport would be compensated for its services by USAID in two ways. For services directly related to the warehousing of the commodities themselves (*e.g.*, inspection and storage), Jacintoport was to invoice and be paid directly by USAID. *Id.* at Schedule B. For other services, such as the stevedoring services at issue here, the Contract provided that Jacintoport would invoice the ocean carrier selected by the PVO at the rates specified in the Contract. USAID, in turn, would reimburse the PVO for the amounts charged by the ocean carrier, which included Jacintoport's charges for stevedoring services.

19. The amount Jacintoport was to be compensated was clearly stated in the Contract, and contained on a detailed Schedule of Rates, Schedule B, which is referenced on the first page of the Contract. Ex. A at 1. Schedule B provides a list of rates for handling and storage that apply to "charges payable by USAID or commodity vendors or carriers for receipt, storage, inspection and re-delivery of commodities . . . ." *Id.* at Schedule B. Among the various rates listed is an unambiguous cap on "Stevedoring (warehouse floor to vessel hold) (Payable by Carriers)" as follows:

> 50 kg bag up to $21.50/mt
> 25 kg bag up to $23.50/mt
> Veg. oil up to $28.50/mt

*Id.* Thus, the Contract explicitly limited the amount Jacintoport could charge for stevedoring services. *Id.*

7

## JACINTOPORT CAUSED FALSE CLAIMS TO BE SUBMITTED

20.     Toward the end of 2007, two individuals at Jacintoport who had principal responsibility for the USAID program and the Contract left the company. In a letter responding to USAID's questions about these departures, Jacintoport President David Labbe assured the agency that Jacintoport "continues to be fully competent to meet all of its contractual obligations under TRN-C-00-07-00044-00." Coinciding with these representations, however, Jacintoport regularly began to charge ocean carriers for stevedoring services in connection with the re-delivery of prepositioned food aid that exceeded the amount permitted by the Contract. This caused the ocean carriers to submit inflated invoices to PVOs, which caused the PVOs to submit false claims to USAID. This false conduct is exemplified by a 2009 delivery of food aid to Zimbabwe.

21.     In the spring of 2009, USAID issued a grant to World Vision, a PVO, for the delivery of approximately 3,500 metric tons of yellow peas to Zimbabwe, which was facing a significant food shortage due to crop failures and social unrest. World Vision proposed to deliver the food aid from prepositioned stocks (previously obtained by the USDA in November of 2008 and stored at Jacintoport's facility in Houston) to Zimbabwe through the seaport in Durban, South Africa. Thus, USAID's grant was for World Vision to load yellow peas at Jacintoport's facility in Houston, Texas, have them shipped to Durban, South Africa, and then delivered to needy people in Zimbabwe.

22.     World Vision, working through a freight forwarder, solicited offers from various ocean carriers for the voyage from Houston, Texas to Durban, South Africa. The solicitation noted that the cargo to be shipped was coming from prepositioned food stocks stored at

8

Jacintoport's warehouse. USAID also transmitted a copy of the solicitation directly to Jacintoport in April 2009, along with a request to confirm the availability of the prepositioned goods (in this case, the yellow peas). Jacintoport confirmed to USAID that the yellow peas were available.

23. To prepare responses to the solicitation, ocean carriers contacted Jacintoport for a quote of fees that would be incurred in connection with the shipment, including fees to load the yellow peas onto the ocean carriers' vessel (*i.e.*, stevedoring charges). The ocean carriers used Jacintoport's fee quote to calculate their overall shipping rate, which they communicated back to World Vision. World Vision transmitted the ocean carrier offers to USAID. At USAID's recommendation, World Vision selected the offer prepared by United Ocean Services, LLC ("United Ocean").

24. Unbeknownst to United Ocean, World Vision, or USAID, United Ocean's offer was inflated by an excessive quote for stevedoring services from Jacintoport. Specifically, Jacintoport's quote specified stevedoring fees of $29.50 per metric ton, which was $8.00 more per metric ton than that allowable under Schedule B of the Contract. United Ocean's offer was consequently inflated by nearly $75,000.00. Neither United Ocean nor World Vision was aware of the overcharges because they were not parties to Jacintoport's Contract with USAID and were unaware of the stevedoring fee cap. USAID was likewise unaware of Jacintoport's overcharges because it only saw United Ocean's overall shipping rate when it reviewed the ocean carrier offers.

25. After being selected for the voyage, United Ocean dispatched its vessel, the Mary Ann Hudson, to Jacintoport's Houston, Texas port to pick up the yellow peas. On May 29, 2009,

approximately 3,500 metric tons of prepositioned yellow peas were loaded from Jacintoport's warehouse onto the Mary Ann Hudson. United Ocean subsequently delivered the peas to Durban, South Africa, so that World Vision could distribute the aid to starving people in Zimbabwe.

26. On May 30, 2009, Jacintoport invoiced United Ocean for stevedoring and other charges in conjunction with loading the Mary Ann Hudson. Jacintoport's invoice claimed a stevedoring rate of $29.50 per metric ton when the Contract allowed only $21.50 per metric ton. As a result, Jacintoport's invoice to United Ocean falsely claimed nearly $75,000.00 in excessive charges for stevedoring services.

27. United Ocean then invoiced World Vision which, in turn, sought reimbursement from USAID. In this case, World Vision submitted a voucher to USAID on June 10, 2009. USAID paid the voucher on July 6, 2009. Accordingly, Jacintoport's submission of its inflated invoice to United Ocean caused United Ocean to submit an inflated invoice to World Vision, which caused World Vision to submit a false claim to USAID.

28. As illustrated by this example, Jacintoport knew when it charged the ocean carriers for stevedoring services that it was handling prepositioned humanitarian food aid subject to the rate caps set forth in Schedule B to the Contract and that USAID would ultimately bear the cost. The requests for quotes Jacintoport received from the ocean carriers specifically noted the voyage was for U.S.-sponsored food aid. Moreover, Jacintoport knew it was being asked to load USAID prepositioned food from its own warehouse. Jacintoport received explicit approval from officials at USAID to release the prepositioned commodities that were stored in Jacintoport's warehouse. Thus, Jacintoport knew that it was providing stevedoring services in connection with

10

prepositioned humanitarian food aid, that those services were governed by Schedule B to the Contract, and that the rates it charged were false. Consequently, Jacintoport's submission of inflated charges for stevedoring services to ocean carriers, which would be passed through to PVOs and presented to USAID for reimbursement, was "knowing" within the meaning of the False Claims Act, 31 U.S.C. § 3729(b)(1).

29. Between January 2008 and continuing through 2009, Jacintoport regularly submitted invoices to ocean carriers that claimed stevedoring fees in excess of the rate caps set forth in Schedule B of the Contract. Upon information and belief, as with the 2009 delivery of emergency food aid to Zimbabwe discussed above, this conduct caused various ocean carriers to submit inflated invoices to PVOs, which then caused the PVOs to submit false claims to USAID. For instance:

- In February 2008, Jacintoport charged $29.50 per metric ton for stevedoring approximately 2,600 metric tons of sorghum (a cereal crop) on board a vessel bound for Mombasa, Kenya, rather than the $21.50 rate allowed by Schedule B, resulting in overcharges of nearly $21,000.00.

- In August 2008, Jacintoport charged $36.50 per metric ton for stevedoring 5,460 tons of vegetable oil on another vessel bound for Mombasa, instead of the $28.50 rate permitted by Schedule B, resulting in overcharges of more than $43,700.00.

- In May 2009, Jacintoport charged $29.50 per metric ton for stevedoring 803 metric tons of yellow peas on board a ship bound for Dar es Salaam, Tanzania, rather than the $21.50 rate set forth in Schedule B, yielding overcharges of nearly $6,500.00.

- In July 2009, Jacintoport charged $31.00 per metric ton to load approximately 1,226 metric tons of corn meal on board a ship bound for Doula, Cameroon, versus the $23.50 rate allowed by Schedule B, resulting in overcharges of more than $9,100.00.

30. This pattern of conduct affected approximately half of the emergency food aid voyages undertaken by USAID while Jacintoport's Contract was in effect. All told, Jacintoport's conduct caused USAID to pay not less than $500,000.00 in excessive stevedoring fees. Attached

11

as Exhibit C is a spreadsheet listing all instances thus far identified where Jacintoport submitted inflated invoices to ocean carriers for stevedoring prepositioned goods, which, upon information and belief, were subsequently presented to and paid by USAID through various PVOs.

## COUNT I
### False Claims Act, 31 U.S.C. § 3729(a)(1) (1986) & 31 U.S.C. § 3729(a)(1)(A) (2009)
### (Submitting, or Causing the Submission of, False Claims)

31.  This is a claim for treble damages and penalties under the False Claims Act against Jacintoport for knowingly presenting or causing to be presented, false or fraudulent claims to the United States.

32.  Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 30, as if fully set forth herein.

33.  From at least January 2008 and continuing through at least September 30, 2009, Jacintoport presented or caused to be presented claims for payment to the United States knowing such claims were false, fictitious, or fraudulent or acting with reckless disregard or deliberate ignorance of the truth or falsity of such claims.

34.  The United States authorized payments to be made out of the Treasury of the United States for these claims.

35.  By virtue of the false, fraudulent, and fictitious claims made, or caused to be made, by Jacintoport, the United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a $11,000 civil penalty for each such false claim presented or caused to be presented.

## COUNT II
### (Breach of Contract)

36.     This is a claim for recovery of the funds paid out by the United States as a result of Jacintoport's breach of the USAID Contract bearing number TRN-C-00-07-00044-00 and the modifications to and extensions thereof.

37.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 30 as if fully set forth herein.

38.     By reason of the acts described above, Jacintoport breached the Contract, thereby causing the United States to sustain damages.

## COUNT III
### (Unjust Enrichment)

39.     This is a claim for the recovery of monies by which Jacintoport has been unjustly enriched, pled in the alternative to Count II, above.

40.     Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 30 as if fully set forth herein.

41.     By directly or indirectly obtaining government funds to which it was not entitled, Jacintoport was unjustly enriched at the expense of the United States, and is liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor and against defendant Jacintoport, as follows:

1.   On Count I, for treble the amount of the United States' single damages and such civil penalties as are required by law in an amount as the Court may determine between $5,500 and $11,000 for each violation, together with all further relief as may be just and proper.

2.   On Count II, for the damages that the United States sustained as a result of Jacintoport's contractual breaches, together with all such further relief as may be just and proper.

3.   On Count III, as an alternative to Count II, the damages sustained by the United States and/or the amounts that Jacintoport was unjustly enriched as the result of Jacintoport's conduct, together with all such further relief as may be just and proper.

4.   Any such other and further relief as the Court may deem just and appropriate.

## JURY DEMAND

The United States demands a trial by jury on all issues so triable.

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General
Civil Division

RONALD C. MACHEN JR., D.C. Bar # 447889
United States Attorney
District of Columbia

DANIEL F. VAN HORN, D.C. Bar # 924092
Civil Chief


_____/s/_____
JENNIFER A. SHORT, D.C. Bar # 456884
Assistant United States Attorney
555 Fourth Street, NW
Washington, DC  20530
Telephone: (202) 307-6078

                                        MICHAEL D. GRANSTON
                                        MICHAL TINGLE
                                        BENJAMIN C. WEI, D.C. Bar. # 491760
                                        Attorneys
                                        Commercial Litigation Branch, Civil Division
                                        U.S. Department of Justice
                                        Post Office Box 261
                                        Washington, D.C. 20044
                                        Telephone: (202) 514-7900

October 19, 2012                         Attorneys for the United States of America

## **CERTIFICATE OF FILING**

I HEREBY CERTIFY that on this 19th day of October 2012, I electronically filed the foregoing United States' Complaint in Intervention with the Court using the CM/ECF system, and thereby sent notice to all registered counsel, including the following:

Megan C. Rahman
Troutman Sanders LLP
1001 Haxall Point
P.O. Box 1122 (23218)
Richmond, VA 23219

Counsel for Relator John Raggio

　　　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　　JENNIFER A. SHORT, D.C. Bar # 456884
　　　　　　　　　　　　　　　　　　　　Assistant United States Attorney
　　　　　　　　　　　　　　　　　　　　555 Fourth Street, NW
　　　　　　　　　　　　　　　　　　　　Washington, DC 20530
　　　　　　　　　　　　　　　　　　　　Telephone: (202) 307-6078